UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | Criminal Action No. 5: 15-104-DCR |
| | ) | and |
| V. | ) | Civil Action No. 5: 21-090-DCR |
| | ) | |
| LONNIE W. HUBBARD, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant/Movant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant/Movant Lonnie Hubbard, a former pharmacist from Berea, Kentucky, was convicted of 71 counts during an eight-day jury trial that began on February 6, 2017. [Record Nos. 350 and 388]  Thereafter, Hubbard was sentenced to a 360-month term of imprisonment, to be followed by a 3-year term of supervised release.  [Record No. 388, pp. 4-5]

Hubbard has now filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  [Record No. 499] The motion was referred to a United States Magistrate Judge for review and issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  On September 24, 2021, United States Magistrate Judge Hanly A. Ingram issued a Recommended Disposition, recommending that Hubbard's motion be denied.  [Record No. 518]  Hubbard filed timely objections.  [Record No. 521]

Although this Court must make a *de novo* determination of those portions of the Magistrate Judge's recommendations to which timely objections are made, 28 U.S.C. §

- 1 -

636(b)(1)(C), "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).  The undersigned has nonetheless carefully reviewed all relevant portions of the record and concludes that Hubbard's claims are entirely without merit.  As a result, the Magistrate Judge's Recommended Disposition will be adopted and Hubbard's motion will be denied.

## I.  Background

Hubbard was a pharmacist licensed to practice in Kentucky with over 7 years of professional experience prior to the events underlying this case.  [Record No. 393, ¶¶ 28, 111]  In 2009**,** he organized Rx Discount, PLLC, a pharmacy in Berea, Kentucky which he owned and operated through 2015.  [*Id.* at ¶ 110.]  Rx Discount dispensed, among other things, pseudoephedrine, oxycodone, and hydrocodone.

Drug wholesale distributors alerted Hubbard that his customers were likely diverting pseudoephedrine to manufacture methamphetamine, and at least four distributors cut ties with Hubbard's business because he refused to change his pseudoephedrine dispensing practices.  [*Id.* at ¶ 29.]  Hubbard was also aware that: a number of customers had drug-related criminal records, including methamphetamine charges; customers would travel considerable distances to purchase pseudoephedrine from his pharmacy; groups of customers would come to Rx Discount to purchase pseudoephedrine in large quantities; and customers would purchase pseudoephedrine with false identification or without identification.  [*Id.* at ¶ 29.]  Although Rx Discount had only one location, it was the top

pseudoephedrine seller among independent pharmacies in Kentucky from 2013 through 2015 and dispensed a disproportionate amount of the drug.  [*See id.* at ¶ 33.]  Additionally, Rx Discount charged excessively high prices for pseudoephedrine pills.  [*Id.* at ¶ 29.] When a former employee confronted Hubbard about the pharmacy's pseudoephedrine sales practices, Hubbard told her that he would deduct from her pay if she cost him money.  [*Id.* at ¶ 43.]  And although Rx Discount's Combat Methamphetamine Epidemic Act training certification, which was necessary for pseudoephedrine sales, lapsed on several occasions between 2011 and 2014, Hubbard's pharmacy continued to dispense the drug during these periods.  [*Id.* at ¶ 38.]

Hubbard's pharmacy also filled oxycodone prescriptions for physicians who had lost the ability to prescribe controlled substances or were under investigation by the Drug Enforcement Administration ("DEA") for unlawful prescribing.  [*Id.* at ¶ 42.]  Relatedly, 28% of the controlled substance prescriptions filled at Rx Discount from 2010 through 2015 were written by out-of-state providers from as far away as Florida, an astronomically high proportion compared to retail chain (5%) and local (2%) pharmacies in Madison County over the same period.  [*Id.* at ¶¶ 42, 51.]  Approximately 71.4% of oxycodone dosage units dispensed by Rx Discount during this period were attributable to out-of-state providers and/or providers sanctioned by the DEA.  [*Id.* at ¶ 51.]  Hubbard also told a confidential informant that he required customers to purchase stool softeners to dilute the narcotics he dispensed.  [*Id.* at ¶ 48.]  He similarly remarked that he required customers to purchase non-controlled substances in connection with controlled substances to keep the

- 3 -

ratio of controlled substances dispensed at a low enough level to evade scrutiny from the government.  [*See id.*]

Following an investigation into these practices, the United States brought a 38-count Indictment against Hubbard, Rx Discount, and others on December 3, 2015.  [Record No. 1]  The grand jury returned a 65-count Superseding Indictment on July 21, 2016.  [Record No. 236]

Hubbard's attorney, James D. Hodge, filed a motion for re-arraignment on September 14, 2016.  [Record No. 276]  According to Hodge's affidavit, he negotiated a non-binding plea agreement with the government, represented by Assistant United States Attorney Ron L. Walker, Jr., through which Hubbard would plead guilty to one charge carrying a statutory maximum of 10 years' imprisonment.[1]  [Record No. 507-1, pp. 1-2]  Hodge considered the proposed agreement to be in his client's "best interests" and advised Hubbard to plead guilty.  [*Id.*]  Hodge states that he did not advise the defendant of a

---

[1]  Hubbard disputes Hodge's assertion that the deal would have resulted in a 10-year maximum term of imprisonment and claims that this plea agreement provided for a plea of guilty to a distribution of pseudoephedrine charge in violation of 21 U.S.C. § 841(c)(2), which would have carried a 20-year statutory maximum term of imprisonment.  [Record No. 513-2, p. 2]  But the § 841(c)(2) charges were first alleged in the Superseding Indictment [Record No. 236], and the proposed plea agreement presented to the United States Probation Office demonstrates that the government planned to dismiss, *inter alia*, the Superseding Indictment in exchange for a guilty plea to the § 843(a)(7) charge brought in Count 2 of the original Indictment, which carried a statutory maximum of 10 years' imprisonment.  [*See* Record No. 1, pp. 5, 26]  Thus, Hodge's affidavit accurately indicates that the negotiated agreement would have resulted in a 10-year maximum term of imprisonment.

specific percentage chance of winning at trial, guarantee success at trial, or express a belief that the government would drop any charges at trial.  [*Id.* at p. 2.]

Hubbard agreed to the plea deal, and the matter was set for hearing on October 12, 2016.  But at the beginning of the change of plea hearing, Hodge advised the Court that the defendant had changed his mind and did not want to plead guilty.  [Record No. 517, p. 2:25-3:3]  Neither Hodge, nor Hubbard advised the Court of the reason for this decision, and there was no discussion of Hubbard's desire to obtain a binding plea agreement.  The hearing transcript, which totals 5 pages, reveals that the Court and the parties immediately proceeded to reschedule the trial after Hodge advised that Hubbard would withdraw from the agreement.  [*Id.* at p. 3:4-4:10.]

The grand jury returned a 73-count Second Superseding Indictment on November 3, 2016.  [Record No. 295]  The case proceeded to trial on February 6, 2017, and Hubbard was convicted on 71 counts relating to: distribution of pseudoephedrine, oxycodone, and hydrocodone; money laundering; and maintaining a drug-involved premises.[2]  [Record Nos. 350 and 393, pp. 1-2]  As noted, the Court imposed a 360-month term of imprisonment, to be followed by a 3-year term of supervised release on June 30, 2017. [Record No. 388, pp. 4-5]

On appeal, counsel moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967), identifying possible issues to contest but notifying the United States Court

---

[2]  The other two counts of the Second Superseding Indictment were dismissed upon motion of the United States at trial.  [Record No. 356]

of Appeals for the Sixth Circuit that his arguments would be frivolous.  [Record No. 442, p. 2]  The Sixth Circuit granted the motion and appointed new counsel, who also filed a motion to withdraw under *Anders*.  [*Id.*]  Hubbard filed two *pro se* supplemental briefs. [*Id.* at pp. 2-3.]  The Sixth Circuit did not find any non-frivolous issues to support an appeal and affirmed the Court's judgment on July 17, 2019.  [*Id.* at pp. 12-13.]  Hubbard filed a petition for a writ of certiorari, which the Supreme Court of the United States later denied on March 30, 2020.  [Record No. 455]

Hubbard's pending § 2255 motion, dated March 27, 2021, was filed by the Clerk on April 2, 2021.  [Record No. 499]  Hubbard contemporaneously filed a motion requesting that the undersigned recuse from consideration of the § 2255 motion.  [Record No. 500] In that motion, the defendant accused the undersigned of maintaining a blanket policy prohibiting binding plea agreements.  [Record No. 500]  The Court issued a Memorandum Opinion and Order denying the motion for recusal, which thoroughly explained that such a policy does not exist while outlining the procedures for accepting and rejecting binding plea agreements, which were not followed in this case because no such agreement was presented to the Court.  [Record No. 503]  Hubbard also filed a motion for leave to conduct discovery, which the Magistrate Judge denied by Order issued July 6, 2021.  [Record No. 508]  Hubbard filed a motion for reconsideration of the Magistrate Judge's Order, which the Court denied by Memorandum Order on July 29, 2021.  [Record No. 512]  After considerable briefing from all parties, the § 2255 motion is now ripe for consideration on the merits.

## II.  Hubbard's Claims

Hubbard alleges four claims for relief in his § 2255 motion:

(1) "Failure of trial counsel to object to improper judicial participation (A Rule 11(c)(1) violation) and judicial misconduct during plea negotiations. Failure of trial counsel to obtain a binding plea agreement";

(2)  Trial counsel failed to advise the defendant certain legal concepts, including "aiding and abetting, Pinkerton Liability, [] Deliberate Ignorance," and the elements of 21 C.F.R. § 1306.04(a);

(3) "Trial counsel failed to object to lay opinion witness testimony that violated Rule 704(b)"; and

(4) "Trial counsel failed to object to Count 60, which failed to state an offense" and, similarly, "[t]he district court lacked subject matter jurisdiction" over Count 60.

[Record No. 499]

Section 2255 permits a prisoner in custody under a federal sentence to move the court that imposed the sentence to vacate, correct, or set it aside on grounds that the "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255.   "A motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001).

Hubbard's claims generally, although not entirely, proceed on ineffective assistance of counsel theories.  A defendant in a criminal prosecution has a constitutional right to

- 7 -

reasonably effective assistance of counsel for his defense.  U.S. Const. amend. VI.  Under the two-part test announced in *Strickland v. Washington*, a defendant challenging his conviction under § 2255 must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  466 U.S. 668, 687 (1984).  "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004).

"Whether counsel's performance was 'deficient' under the first prong is determined by reference to 'an objective standard of reasonableness'—specifically, 'reasonableness under prevailing professional norms.'"  *Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018) (quoting *Strickland*, 466 U.S. at 688).  "This inquiry 'consider[s] all the circumstances' of a particular case."  *Id.* (quoting *Strickland*, 466 U.S. at 688-89).  "In assessing performance, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'"  *Hutchinson v. Bell*, 303 F.3d 720, 754 (6th Cir. 2002) (quoting *Strickland*, 466 U.S. at 690-91).  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.

Regarding the second prong of the *Strickland* test, a defendant must "affirmatively prove prejudice."  *Hendrix*, 893 F.3d at 921 (quoting *Strickland*, 466 U.S. at 693).

"Counsel's errors must have 'actually had an adverse effect on [the defendant's] defense.'"
*Id.* (quoting *Strickland*, 466 U.S. at 693).

## A. Binding Plea Agreement Arguments

Hubbard first alleges that the undersigned has issued "proclamations" against binding plea agreements. [*See* Record No. 499-1, pp. 4-11.] His arguments range from suggestions that such a policy impacted the plea negotiations between AUSA Walker and Hodge, such that the government did not offer a binding plea agreement because it believed it was futile, to direct accusations of "Orwellian mischief" by the Court in "circumvent[ing] appellate court review by proclaiming this policy . . . off-the-record, out of open court to prevent review" and "asking other district court members to be complicit in [the] illegal scheme." [*Id.* at pp. 4, 9.] Hubbard claims that the undersigned's "policy" amounted to judicial misconduct and improper participation in plea negotiations, faulting counsel for failing to challenge the alleged policy and negotiate a binding plea agreement. [*See id.* at pp. 6-11.]

The Court addressed the majority of the defendant's accusations, which are entirely baseless, when it denied his motion requesting recusal in the April 15, 2021 Memorandum Opinion and Order. In doing so, it explained several reasons that might merit the rejection of a binding plea agreement under Rule 11(c)(3)(A) of the Federal Rules of Criminal Procedure (a decision which may benefit a defendant) and outlined the procedure that must be followed if a court decides to reject a binding plea agreement and would have been followed if the Court had rejected a binding plea in this case. [Record No. 503, pp. 5-6]

The undersigned also explained that there is, in fact, no blanket policy of rejecting binding plea agreements.  [*Id.* at pp. 5-7.]   As the Magistrate Judge's Recommended Disposition indicates, the Court has accepted binding plea agreements in the past.[3]  [Record No. 518, p. 6 n. 4 (citing *United States v. Carmack*, No. 6:13-013-DCR-HAI, Record No. 35 (E.D. Ky. Dec. 26, 2013).]

Hubbard's objections to the Recommended Disposition focus on the Court's alleged judicial participation in plea negotiations through its phantom policy and corresponding misconduct, rather than his ineffective assistance of counsel claims pertaining to this issue.  [Record No. 521, pp. 3-4]   Rule 11(c)(1) clearly prohibits judicial participation in plea discussions between parties.  But "a district court [does] not improperly participate in plea negotiations where there [is] 'no indication in the record that [the court] had discussions with counsel concerning the facts of [the defendant's] case, any aspect of sentencing, or [the defendant's] possible guilt or innocence.'"  *United States v. Perez-Yanez*, 511 F. App'x 532, 536 (6th Cir. 2013) (first two alterations added) (quoting *United States v. Rankin*, 94 F.3d 645, 1996 WL 464982, at *2 (6th Cir. 1996) (per curiam table opinion)).

The Court did not participate in plea negotiations whatsoever.  No binding plea was presented to the Court such that it could take such action, and the defendant did not indicate that his desire for a binding plea agreement was the reason for his decision to proceed to

---

[3]  Hubbard's objections acknowledge that the undersigned may not refuse to consider or reject "all" binding plea agreements in light of the *Carmack* case, but he continues to allege that the undersigned has a policy of doing so.  [Record No. 521, p. 2, n. 1]   Needless to say, this concession weakens his argument.

trial. Indeed, the transcript of the October 12, 2016 would-be re-arraignment hearing evidences no discussion of the defendant's dissatisfaction with his inability to procure a binding plea agreement. Thus, to the extent Hubbard directly challenges the Court's conduct in this case, his arguments are frivolous.

Notwithstanding this point, the ineffective assistance of counsel arguments themselves fail on the merits. Counsel's performance regarding plea negotiations was not deficient. Hodge did not make any guarantees regarding Hubbard's chances of success at trial. And he actually negotiated a plea agreement that he believed to be in Hubbard's "best interests." [Record No. 507-1, pp. 1-2.] This deal was, at the time and certainly in retrospect, the product of effective negotiation by Hodge. And although Hubbard states that he advised Hodge that he would only accept a binding plea agreement capping his term of incarceration at 5 years [Record No. 499-2, p. 3], he recognized, to some extent, the value of the deal his attorney negotiated and accepted it prior to withdrawing it later at the re-arraignment hearing. Further, counsel could not be deficient in failing to object to the non-existent policy prohibiting binding plea agreements where the government did not actually offer one.

Additionally, Hubbard has not demonstrated prejudice. "[I]n the context of plea negotiations, to demonstrate prejudice, a petitioner must establish a reasonable probability that, but for counsel's unprofessional errors, the outcome of the plea process would have been different." *Byrd v. Skipper*, 940 F.3d 248, 258 (6th Cir. 2019) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)); *cf. Strickland*, 466 U.S. at 694 (explaining that "[a] reasonable

probability is a probability sufficient to undermine confidence in the outcome."). But "a defendant has no right to be offered a plea, nor a federal right that the judge accept it . . . ." *Missouri v. Frye*, 566 U.S. 134, 148 (2012) (internal citations omitted). "[B]ecause there is no right to a plea offer, where a petitioner alleges ineffective assistance of counsel prevented plea negotiations, demonstrating prejudice requires that he establish a reasonable probability that but for counsel's errors, the petitioner would have received a plea offer." *Byrd*, 940 F.3d at 257 (citing *Lafler v. Cooper*, 566 U.S. 156, 163-64 (2012); *Frye*, 566 at 148-49). "[A] petitioner must also show that he would have accepted the offer, the prosecution would not have rescinded the offer, and that the trial court would not have rejected the plea agreement." *Id.* at 257 (citations omitted). "A petitioner raising this variety of *Strickland* claim thus faces a formidable standard . . . ." *Id.*

Hubbard has not met any facet of this standard. As the United States points out, it was not obligated to entertain binding plea negotiations and "Hubbard has not provided any agreement or agreed terms forming the basis of a binding plea approved by the United States Attorney that would have been submitted" to the Court. [Record No. 507, pp. 6-7] Hodge's affidavit establishes that he discussed the "potential for binding plea agreements" with AUSA Walker [Record No. 507-1, p. 1], but there is no suggestion that these discussions materialized to the extent that the Court could conclude that there is a reasonable probability that such a binding plea offer would have been made (and not rescinded) absent assumptions regarding whether the undersigned would accept the plea.

Additionally, Hubbard has not established that the United States would have been willing to offer a plea bargain on *his* terms, *i.e.*, an agreement that would have capped his imprisonment at five years.  He states that Hodge told him that AUSA Walker "seemed willing" to agree to such an arrangement, but such speculation falls far short of indicating a reasonable probability that he would have received the plea offer he desired.  [Record No. 499-2, p. 3]  And while it is clear that the United States did offer a plea agreement that would have capped the defendant's term of imprisonment at 10 years, this offer does little to evidence a willingness to negotiate a 5-year binding plea.

Further, while the undersigned does not maintain a blanket policy rejecting binding plea agreements, the defendant cannot demonstrate that the Court would have accepted a plea agreement on Hubbard's terms.  When parties reach a plea agreement, the "defendant is entitled to plead guilty unless the district court can articulate a sound reason for rejecting the plea."  *United States v. Cota-Luna*, 891 F.3d 639, 647 (6th Cir. 2018) (quoting *United States v. White*, 308 F. App'x 910, 915 (6th Cir. 2009)).  But this is not a particularly high threshold in the context of Rule 11(c)(1)(C) binding pleas.

For example, the parties in *United States v. Sabit* negotiated a binding plea agreement under Rule 11(c)(1)(C).  797 F. App'x 218, 221 (6th Cir. 2018).  The district judge informed the parties that he "had no categorical rule against Rule 11(c)(1)(C) agreements" but could not accept the specific plea agreement because he believed that the stipulated sentence deprived him of the discretion to sentence the defendant in accordance with the facts of the case.  *Id.* at 221.  The Sixth Circuit concluded that the "the district

judge appropriately exercised his discretion," finding that "when a judge thinks the agreed-upon terms [of a binding plea agreement] unduly cabin his sentencing discretion, he can reject the agreement." *Id.* at 221-222 (citing *In re Morgan*, 506 F.3d 705, 712 (9th Cir. 2007); *In re United States*, 503 F.3d 638, 641 (7th Cir. 2007)); *see also United States v. George*, 804 F. App'x 358, 362 (6th Cir. 2020) (finding no abuse of discretion where the district court rejected a binding plea that provided a sentence inconsistent with the 18 U.S.C. § 3553(a) factors).  Put differently, "the district court owes zero deference to the sentencing determinations of the parties" and may reject a binding plea agreement when it "thinks it *might* want to impose a different sentence than the one chosen by the parties — even, say, a sentence different by only a month . . . ."  *Cota-Luna*, 891 F.3d at 651 (Kethledge, J., concurring) (emphasis in original).

Assuming Hodge could have negotiated a binding plea agreement to Hubbard's liking or had challenged the Court's nonexistent policy against nonbinding plea agreements, the Court would not have been obligated to accept a binding plea if sound reasons counseled against it.  Sound reasons may have included a belief that the sentence contemplated in the plea agreement inappropriately cabined the Court's sentencing discretion under the facts of the case and was not consistent with the § 3553(a) factors. Hubbard asks the Court to engage in a number of assumptions not supported by the record to reach this point in the analysis, but even if one credits his other arguments, he has not shown that there is a reasonable probability that the Court would have accepted a binding

plea agreement on his stated terms, particularly in light of the seriousness of his criminal conduct.

At bottom, Hubbard's binding plea arguments are speculative and without merit. Hodge negotiated a plea agreement that would have, in fact, benefited the defendant, and the defendant made a conscious decision to withdraw from that agreement and proceed to trial despite counsel's advice to the contrary. He now seeks to blame the Court and Hodge for the sentencing consequences of *his* own decision. But dissatisfaction with his sentence, without more, is not a basis for *habeas* relief.

### B.  Failure to Advise of Legal Concepts

Hubbard next asserts that Hodge failed to advise him of several legal concepts relevant to his convictions, including: aiding and abetting liability; *Pinkerton* liability; deliberate ignorance; and the fact that he could have been convicted for his illegal distribution of hydrocodone and oxycodone charges (Counts 15 through 59 of the Second Superseding Indictment) under 21 U.S.C. § 841(a)(1) and 21 C.F.R. § 1306.04(a) upon a showing by the government of either distribution not for a legitimate medical purpose *or* distribution outside the course of professional practice. [Record No. 499-1, pp. 13-19]

Although he does not assert that the jury instructions pertaining to these concepts were erroneous, Hubbard alleges that Hodge failed to review the proposed instructions raising these issues until the eighth day of trial. [Record No. 513, pp. 7-10] He believes Hodge's purported failure prejudiced him because he was not informed of the law on these issues such that he could assess the case against him and take a plea. [*Id.* at pp. 8-9; Record

No. 499-1, p. 19 ("Mr. Hodge should have realized Petitioner's arguments would fail and should have estimated his chances of winning at trial at zero while highly recommending a plea deal."); Record No. 513-2, p. 5 (claiming that with proper advice, "I would have known that my defensive arguments to the government's allegations were specious with little chance to succeed and negotiated a plea agreement."); Record No. 521, pp. 6-7 ("Petitioner alleges trial counsel failed to properly advise Petitioner on necessary legal concepts and implications and also that trial counsel misadvised Petitioner because of counsel's ignorance of the relevant law that led Petitioner further away from pleading guilty.").]

Hodge's affidavit states that he explained aiding and abetting liability on multiple occasions prior to trial, "including but not limited to, when we reviewed the Indictment together, when we discussed proposed plea agreements with AUSA Walker, when we went through the proposed jury instructions[] during trial and [while] planning cross-examination for multiple witnesses, and during trial preparation." [Record No. 507-1, p. 2] He also attests that while he may not have used the term *Pinkerton* liability, he explained liability for conspiracies and "showed Mr. Hubbard examples of drawings that illustrated conspiracy liability and explained that defendants can be liable for the reasonably foreseeable acts of co-defendants even if the defendant did not directly participate in said acts." [*Id.* at p. 3.]

Hodge states that while he may not have used the term deliberate ignorance prior to reviewing jury instructions with the defendant, he explained the issue while reviewing jury

- 16 -

instructions and noted, *inter alia*, the facts that he "could not only be convicted for things he knew, but also for things he should have known" and that he could potentially be held liable for the "actions of his employees/clients both in his presence in and outside his presence." [*Id.*]   Counsel further indicates that he and the defendant discussed the relationship between distributing without a legitimate medical purpose and distributing outside the course of professional practice "many times." [*Id.*]  He similarly states that he and the defendant "went through every single jury instruction together multiple times" and that he "explained every one of them, answered any questions Mr. Hubbard had, and discussed potential changes and tactics in regards to jury instructions and formed a plan of action together [with the defendant]." [*Id.* at p. 4.]

And importantly, Hubbard faults counsel for failing to recognize the strength of the government's position on these issues and failing to advise him to plead guilty.  But Hodge *did* negotiate a plea deal he deemed to be in the best interests of his client and advised him to plead guilty.  It was Hubbard who ultimately rejected the deal.  Based on the foregoing, Hubbard is unable to demonstrate constitutionally inadequate performance.

Notwithstanding this failure, Hubbard has not demonstrated prejudice.  Hubbard has not shown that he would have been able to negotiate a plea agreement suitable to him after he rejected the favorable agreement negotiated by counsel.  [*See* Record No. 499, pp. 9-11.]  His conclusory assertions that he would have negotiated a plea with better advice on these legal concepts "fall far short of showing actual prejudice."  *Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007).  He had no right to a different plea offer as a matter of

- 17 -

course, and he cannot show that the government would have offered him another deal on terms that he found suitable.  And based on his other arguments, only a binding plea agreement capping his term of imprisonment at 5 years could satisfy the defendant. Hubbard cannot demonstrate that the Court would have accepted such a plea.

Hubbard's objections to the Recommended Disposition challenge the proposition that he would have only accepted a binding plea had he been fully advised of the legal concepts he discusses and his likelihood of success.  [Record No. 521, pp. 7-8]  He claims that he would have accepted another non-binding plea had he been advised of these legal concepts.  [*Id.*]  He also seems to suggest that he can demonstrate prejudice because better advice would have influenced him to accept the original plea deal, an agreement which would have likely been accepted by the Court.  [*Id.* at pp. 8-9.]

Put simply, these assertions are not credible.  Hubbard's filings in this § 2255 proceeding have incessantly blamed counsel and the Court for his failure to obtain a binding plea agreement on *his* preferred terms.  Moreover, Hubbard claims that he told counsel that he would *only* accept a binding plea on these terms.  It is easy for Hubbard to now contend that he would accept any plea agreement set in front of him with information on certain legal issues.  But he has not established this to be true.  Instead, Hubbard has failed to demonstrate prejudice even if counsel should have provided better or earlier advice regarding the legal concepts he cites.

### C.  Failure to Object to Lay Witness Testimony that Violated Rule 704(b)

Hubbard faults his attorney for failing to object to ten separate statements by four investigators during his testimony at trial, claiming that they constituted impermissible ultimate issue testimony under Federal Rule of Evidence 704(b).  [Record No. 499-1, pp. 20-24]  The first five of these statements were made by Jill Lee, a pharmacist employed by the Drug Enforcement and Professional Practice Branch of the Kentucky Office of Inspector General who interviewed Hubbard.  [*See* Record Nos. 427, p. 197:8-18 and 499-1, pp. 21-22.]  Specifically, Hubbard claims that Hodge should have objected to the following testimony, which was offered in the context of identifying "red flags" associated with Hubbard's practices:

> (1)    Lee's concern that groups of customers receiving "cookie-cutter pattern" prescriptions from Rx Discount were "[groups of] patients that are known abusers and diverters of pills" [Record No. 427, pp. 205:10-207:6];

> (2)    Lee's belief that customers were "probably making methamphetamine out of this product [, *i.e.*, pseudoephedrine]," based on the high price and lack of variety of pseudoephedrine products at Rx Discount [*id.* at pp. 218:11-219:8];

> (3)    A statement that, based on Lee's experience, "[y]ou know [those customers are] probably abusing [prescriptions], and those are the patients that you should be addressing that you shouldn't be filling prescriptions for," made when asked whether a pharmacist would normally accept payment to fill prescriptions faster or before those ordered by other patients, as Hubbard admitted to doing [*id.* at p. 221:9-21];

> (4)    Lee's statement that Hubbard's interview remarks indicated to her that he was "basically just ignoring the patients that were coming in there, what -- the clientele that they were abusing and diverting and still filling these prescriptions that were not legitimate prescriptions" [*id.* at 222:8-15]; and

- 19 -

(5)   Lee's testimony that Hubbard's admission that he wanted to limit out-of-state prescriptions he filled "indicated to [her] that he probably knew that that was -- they were not legitimate prescriptions and that he shouldn't be filling them, so he was trying to limit them." [*id.* at p. 226:10-15.]

[Record No. 499-1, pp. 21-22.]

Hubbard claims that Hodge should have objected to testimony from Shannon Allen, a pharmacist employed as an inspector for the Kentucky Board of Pharmacy who also interviewed Hubbard. [*See* Record Nos. 431, pp. 8:18-9:25, 18:23-19:3 and 499-1, pp. 22-23.] Hubbard takes issue with counsel's failure to object to two pieces of Allen's testimony, which were made in the context of identifying "red flags" evident in audio recordings of her interview with Hubbard:

(1)   Allen's statement, after reviewing an audio segment of Hubbard's interview, that "[w]hen a customer comes to a pharmacy to buy pseudoephed[rine], we educate all pharmacists that you do ask why -- why are you buying it? If it's for a stuffy nose, that's great. But you don't just not ask and sell it to anybody that walks up" [Record No. 431, pp. 31:23-32:2];[4] and

(2)   Allen's observation that "you start rearranging when people get prescriptions filled so that way you can kind of cover your tracks," made

---

[4] Hubbard's argument regarding the propriety of this particular statement is not entirely clear. He variously indicates that, consistent with his overarching argument, it was improper ultimate issue testimony, while also asserting that Allen misstated the law by indicating that he had a "legal duty" to ask every customer why he sought to purchase pseudoephedrine. [*See* Record Nos. 499-1, pp. 22-25 and 521, pp. 12-13.] He additionally claims that this "legal duty" testimony misled the Court during sentencing proceedings and requests an evidentiary hearing on this specific issue to determine whether he should be resentenced. [Record No. 521, pp. 12-13] But Hubbard misconstrues Allen's statement. She did not testify about such a "legal duty," as this statement, like those of Lee, York, and Altamirano, concerned "red flags" evident in facts revealed during the investigation of his practices. [*See* Record No. 431, pp. 31:22-32:2.]

- 20 -

while explaining why Hubbard's "patients were told to wait to get their prescription, either that evening, [or] later the next day" [*id.* at p. 33:11-22.]

[Record No. 499-1, pp. 22-23]

Hubbard next complains that counsel should have objected to two statements made by Paula York, a pharmacist employed by the Kentucky Inspector General who investigates violations of the Kentucky Controlled Substance Act. [Record Nos. 429, p. 22:11-15 and 499-1, pp. 23-24] He specifically contests the following statements made by York:

> (1)   A statement that she "can't foresee any situation where you would need to prescribe a 15 milligram [oxycodone dose] and 30 milligram [oxycodone dose] together to the same patient," made in the context of describing red flags associated with unlawful prescribing and filling of prescriptions [Record No. 429, pp. 30:8-32:5-11]; and

> (2)   York's remark that "Lonnie Hubbard did not fulfill his corresponding responsibility by making sure the prescriptions were for a legitimate medical need on the 7,500 prescriptions that I identified," in response to a question about her "opinion as to whether Lonnie Hubbard and RX Discount were acting within the standards of professional practice of pharmacists." [*Id.* at p. 44:5-12]

[Record No. 499-1, pp. 23-24] Finally, Hubbard contends that his attonrey should have objected DEA Diversion Investigator Luis Altamirano's determination that individuals "traveled to these Georgia and Florida clinics to obtain controlled substances where there was no legitimate medical need, and returned to Kentucky to fill these prescriptions at RX Discount of Berea." [Record Nos. 425, pp 101:23-102:1 and 499-1, p. 24]

Rule 704(b) of the Federal Rules of Evidence provides that, "in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."

- 21 -

But "[l]aw enforcement officers may testify concerning the methods and techniques employed in an area of criminal activity and to establish 'modus operandi' of particular crimes." *United States v. Pearce*, 912 F.2d 159, 163 (6th Cir. 1990). In evaluating expert opinion testimony from a law enforcement officer under Rule 704(b), courts consider whether the witness "actually referred to the intent of the defendant or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent." *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004) (quoting *United States v. Frost,* 125 F.3d 346, 383-84 (6th Cir. 1997)).

When considered in their respective contexts, nearly all of the contested statements are investigators' conclusions based on their experiences with common practices (red flags) of pharmacists and pharmacies, like Hubbard and Rx Discount, that engage in unlawful conduct. The defendant broadly asserts that the ten statements were inappropriate ultimate issue testimony because they concern his knowledge and intent; however, they tend to support an *inference* of knowledge and intent without inappropriately informing the jury that he had the requisite mental state for any of the crimes charged. And some testimony, such as York's second statement, bear more on his actions than intent, while others, such as Diversion Investigator Altamirano's statement do not, standing alone, necessarily bear on the defendant's acts or mental state. Generally, the Court can find no reason why Hodge should have objected to these statements on Rule 704(b) grounds.

But even if any statement did violate the rule, the defendant has not demonstrated prejudice.  As the Magistrate Judge concluded, "Hubbard fails to state why he would have been acquitted if the ten complained of statements had been objected to and excluded" and likewise "fails to provide any reasoning as to why the entirety of the other testimony provided over the course of the eight-day trial would have been insufficient for his conviction."  [Record No. 518, p. 12 (citing *Brucker v. United States*, 1:08-CR-5, 2012 WL 381593, at *11 (E.D. Tenn. Feb. 6, 2012) ("Nevertheless, even assuming counsel was deficient for failing to object to such testimony, [the defendant] has not demonstrated that but for counsel's failure to object to the testimony there is a reasonable probability the outcome of the trial would have been different.").]

Hubbard objects that his *pro se* motion should be construed liberally and asserts that he has argued that he would have reasonably been acquitted.  [Record No. 521, pp. 10-12] But he makes no specific argument regarding the insufficiency of the other evidence at trial.  And "[l]iberal construction does not require a court to conjure allegations on a litigant's behalf."[5]  *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (alteration in original) (quoting *Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001)).

---

[5]  Hubbard's objections include a recurring rejoinder that the Court should construe his filings liberally when assessing his arguments of prejudice.  [Record No. 521, pp. 6-7, 11-12]  In Hubbard's estimation, liberal construction means that the Court should  grant relief despite the fact that he has not demonstrated prejudice.  But this is not the applicable standard.  He is responsible for affirmatively demonstrating prejudice.  *Hendrix*, 893 F.3d at 921.

Hubbard's only attempt to specifically articulate prejudice is his assertion that Hodge's failure to object to these ten statements subjected him to plain error review on appeal.  [*See*, *e.g.*, Record Nos. 499-1, p. 25 and 521, pp. 11-12.]  What Hubbard means by this is not clear.   He may be referencing the Sixth Circuit's determination that the lack of a dual-role cautionary jury instruction regarding the investigators' lay and expert opinion testimony was not plain error because: (1) the jury understood how to weigh these investigators' opinions due to an instruction regarding York that the Court did, in fact, give; and (2) the concerns of Lee and Allen were corroborated by other witnesses.[6] [Record No. 442, pp. 6-7]  If he intends to challenge this point (which is an issue separate from his Rule 704(b) challenges), he has not shown prejudice stemming from counsel's failure to act because, as the Sixth Circuit found, the jury was instructed how to evaluate mixed fact and opinion testimony and these opinions were supported by other evidence.  He has not shown that, but for counsel's failure to act on this issue during trial, there is a reasonable probability that he would have been acquitted.

Alternatively, Hubbard may be asserting that he was prejudiced because he *would have been* subjected to plain error review on the Rule 704(b) issue, which was not addressed on direct appeal [*see* Record No. 442], due to counsel's failure to object to the ten statements he contests.  But again, he has failed to demonstrate prejudice.  He has not

---

[6]  It seems likely that this is what Hubbard references when he discusses the plain error prejudice because he repeatedly emphasizes that these investigators were lay witnesses. [*See*, *e.g.*, Record No. 499-1, pp. 19-25.]

shown that there was a reasonable probability that the results of trial would have been different if counsel had lodged successful objections to any of them.

Hubbard's arguments regarding the ten statements made by investigators are without merit. Accordingly, relief is not warranted on this claim.

### D.  Alleged Deficiencies in Count 60

Finally, Hubbard asserts that his conviction on Count 60 should be vacated. Count 60 alleged that Hubbard:

> did knowingly and intentionally open and maintain and manage and control, whether permanently or temporarily, a place, namely, RX DISCOUNT . . . for the purpose of distributing and dispensing, outside the scope of professional practice and not for a legitimate medical purpose, a quantity of pills containing oxycodone, a Schedule II controlled substance, and pseudoephedrine, a listed chemical, in violation of 21 U.S.C. § 841(a)(l) and (t)(l), all in violation of 21 U.S.C. § 856(a)(l).

[Record No. 295, p. 11] The Court instructed the jury that oxycodone is a controlled substance and pseudoephedrine is a listed chemical.  [Record No. 360, p. 35] The instructions also provided that a conviction on this charge required a finding that:

> the defendant opened and maintained . . . Rx Discount . . . for the purpose of distributing oxycodone, a controlled substance, outside the scope of professional practice and not for a legitimate medical purpose, or pseudoephedrine, a listed chemical, knowing, intending, or having reasonable cause to believe that it would be used to manufacture a controlled substance.

[*Id.*] The instructions indicated that Hubbard could be convicted if the jury found that he "opened, maintained, managed, and controlled a place for distributing pills containing oxycodone outside the scope of professional practice and not for a legitimate medical purpose, and pseudoephedrine while knowing, intending, or having reasonable cause to

- 25 -

believe that it would be used to manufacture Methamphetamine . . . ."  [Record No. 361, p. 13]

The relevant statute, which criminalizes the maintenance of drug-involved premises, states: "Except as authorized by this subchapter, it shall be unlawful to . . . knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance."   21 U.S.C.  §  856(a)(1).   Hubbard contends that the inclusion of pseudoephedrine in Count 60 renders the charge defective because it is a listed chemical rather than a controlled substance.   [Record No. 499-1, pp. 26-28]  His argument takes various, but related forms.  First, he claims that Count 60 fails to state a cognizable offense. [*Id.* at p. 26.]  Second, he asserts that the Court lacks subject matter jurisdiction over Count 60 because it failed to state an offense.  [*Id.* at p. 27.]  Third, he alleges that Hodge's failure to object to Count 60 constituted ineffective assistance of counsel.  [*Id.* at pp. 27-28.]

The Magistrate Judge correctly found that this issue was already litigated during Hubbard's direct appeal.  [Record No. 518, pp. 13-15]  In a *pro se* brief on appeal, Hubbard claimed that "pseudoephedrine is not an element of § 856(a)(1)" because it is a listed chemical and that Count 60 failed to state an offense.  *United States v. Hubbard*, No. 17-5853, Record No. 31, p. 18 (6th Cir. June 4, 2018).  The Sixth Circuit considered, but summarily rejected this argument:

> Nor can any non-frivolous argument be raised in connection with the jury instructions on the charge of operating and maintaining a drug-involved premises, Count 60 of the indictment, or that count's failure to state an offense.  The record reflects that the district court changed the instructions

based on Hubbard's concerns that jurors might believe that distributing pseudoephedrine was, in and of itself, illegal.

[Record No. 442, p. 8]  "It is . . . well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999) (citing *Davis v. United States*, 417 U.S. 333, 345 (1974); *Oliver v. United States*, 90 F.3d 177, 180 (6th Cir. 1996)).  Hubbard cites no intervening change in law.  Indeed, he cites no authority in support of his interpretation of the § 856(a)(1).

Hubbard objects that the Court must address his jurisdictional argument regardless of the Sixth Circuit's decision, arguing that it must *sua sponte* assess jurisdiction.  [Record No. 521, pp. 13-14]  But the Sixth Circuit found that there were not *any* non-frivolous arguments concerning this issue which, as the Magistrate Judge notes [Record No. 518, p. 14], would appear to encompass jurisdictional arguments.  Additionally, his jurisdictional claim proceeds on the same argument as his argument on appeal, namely, that the inclusion of pseudoephedrine rendered the charge defective because it is not a controlled substance.

But even if this were not true, he offers no reason to vacate his conviction on a jurisdictional basis.  He has presented no caselaw indicating that the charge was defective. Moreover, as the United States argues [Record No. 507, p. 16], § 856(a)(1) can be violated in a number of ways that do not involve using a premises to unlawfully distribute a controlled substance, including by maintaining a place for the purpose of *manufacturing* any controlled substance.  The jury instructions and verdict form drew this distinction by indicating that the relevant consideration regarding pseudoephedrine was whether Hubbard

knew that Rx Discount was distributing pseudoephedrine used to manufacture methamphetamine. And methamphetamine *is* a Schedule II controlled substance. *See*, *e.g.*, Controlled Substances - Alphabetical Order, DRUG ENFORCEMENT ADMINISTRATION, https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf (last visited November 8, 2021).

Hubbard also objects to the Magistrate Judge's conclusion that he "cannot show any prejudice from trial counsel's failure to raise a frivolous objection." [Record Nos. 518, p. 15 and 521, pp. 14-15] He notes that the ineffective assistance of counsel claim is different from the other Count 60 contentions in that it asserts that his Count 60 arguments were discarded on appeal as invited errors because Hodge argued for and approved the relevant wording of the jury instructions. [*See* Record No. 521, pp. 14-15.]

A cursory reading of the Sixth Circuit's brief commentary on this issue reveals that this is not true. Hubbard's central claim, here and on appeal, is that the charge *itself*, rather than jury instructions, was defective and failed to state an offense. While the Sixth Circuit noted that the Court had changed the final instructions in accordance with counsel's concerns regarding the facial legality of pseudoephedrine distribution, it also explicitly found there to be no non-frivolous argument regarding Count 60 or its alleged failure to state an offense. By ruling on the charge itself, which is unrelated to Hodge's actions, the Sixth Circuit did not restrict its analysis to invited error considerations, if it contemplated this doctrine in the first place. *See*, *e.g., United States v. Demmler*, 655 F.3d 451, 458 (6th Cir. 2011) (explaining that the invited error doctrine provides that "when a party has

- 28 -

himself *provoked* the court to commit an error, that party may not complain of the error on appeal unless that error would result in manifest injustice) (emphasis added).

Regardless, Hubbard has not met the requirements of *Strickland* for this claim.  He has not shown that the inclusion of pseudoephedrine in Count 60 rendered the charge defective such that Hodge should have raised this issue.  He has accordingly failed to demonstrate deficient performance or prejudice.[7]  Hubbard's Count 60 arguments are entirely without merit and do not warrant relief.

### III.  Evidentiary Hearing

Hubbard requests an evidentiary hearing regarding his § 2255 motion.  [Record No. 499-1, pp. 3-4]   "Unless the [§ 2255] motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).  However, "no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."  *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (internal quotation marks and citation omitted).

---

[7]  It is also worth noting that Hubbard does not, and cannot reasonably, contest that he could have been convicted for maintaining a premises for the purpose of unlawfully distributing oxycodone under § 856(a)(1) as charged in the Second Superseding Indictment.  [*See* Record No. 295, p. 11.]

The record in this case includes, *inter alia*, counsel's affidavit, the change of plea hearing transcript, trial transcripts, and the defendant's direct appeal.  The defendant's claims are comprised of arguments that are contradicted by the record, inherently incredible, and conclusions rather than statements of fact.  Therefore, the request for an evidentiary hearing will be denied.

### IV.  Certificate of Appealability

The Court must issue or deny a certificate of appealability when it enters a final order that is adverse to the movant in a § 2255 proceeding.  Rule 11 of the Rules Governing § 2255 Proceedings for the United States District Courts; 28 U.S.C. § 2253(c)(1)(B).  A certificate of appealability may be issued only when the defendant has "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To satisfy this burden, the defendant must show that reasonable jurists could debate whether the petition should have been resolved in a different way or that the issues involved were adequate to proceed further.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For rulings on the merits, the defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  When a motion is denied on procedural grounds, a certificate of appealability may issue when the defendant establishes that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

Reasonable jurists would not debate this Court's conclusions. The defendant's primary ground for relief is premised on a nonexistent policy of the Court, the Court did not meddle in plea negotiations, and the defendant has not demonstrated that his representation relating to the binding plea issue was defective or prejudicial. He also cannot demonstrate constitutionally inadequate representation for his ineffective assistance of counsel claim relating to Hodge's alleged failure to advise him of certain legal concepts and recommend a plea of guilty. The trial testimony he contests is generally acceptable under Rule 704(b) of the Federal Rules of Evidence, but even if it were not, Hubbard has not demonstrated that he was prejudiced by counsel's failure to object to it. Finally, the Count 60 defect argument has already been addressed by the Sixth Circuit, and he has not demonstrated that the charge was, in fact, defective. Further, he has not established ineffective assistance of counsel in connection with Count 60. Accordingly, no certificate of appealability will issue.

## V. Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.     Defendant/Movant Lonnie Hubbard's motion to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255 [Record No. 499] is **DENIED**.

2.     The Magistrate Judge's Recommended Disposition [Record No. 518] is **ADOPTED** and **INCORPORATED** here in full. Hubbard's objections [Record No. 521] are **OVERRULED**.

- 31 -

3.      Hubbard's request for an evidentiary hearing is **DENIED**.

4.      A Certificate of Appealability shall not issue.

Dated: November 10, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky